1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                      FOR THE DISTRICT OF OREGON

10

11  ROBERT HAMPTON,                )
                                   )    No. CV 08-538-HU
12              Plaintiff,         )
                                   )
13       v.                        )
                                   )    FINDINGS AND
14  MICHAEL J. ASTRUE,             )    RECOMMENDATION
    Commissioner, Social           )
15  Security Administration,       )
                                   )
16              Defendant.         )
    ───────────────────────────────)
17
    Rory Linerud
18  P.O. Box 1105
    Salem, Oregon
19       Attorney for plaintiff

20  Karin J. Immergut
    United States Attorney
21  District of Oregon
    Britannia Hobbs
22  Assistant United States Attorney
    1000 S.W. Third Avenue, Suite 600
23  Portland, Oregon 97204
    Terrye E. Shea
24  Special Assistant United States Attorney
    Office of the General Counsel
25  Social Security Administration
    701 Fifth Avenue, Suite 2900 M/S 901
26  Seattle, Washington 98104
         Attorneys for defendant
27

28  FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Robert Hampton brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for Supplemental Security Income benefits under Title XVI of the Social Security Act.

### Procedural Background

Mr. Hampton filed an application for benefits on February 6, 2003 with an alleged onset date of January 1998. The application was denied initially and upon reconsideration. Mr. Hampton requested a hearing, which was held on September 1, 2005 before Administrative Law Judge (ALJ) William Stewart Jr. On November 9, 2005, the ALJ issued a decision finding Mr. Hampton not disabled. Mr. Hampton requested Appeals Council review, which was denied. Mr. Hampton appealed to the United States District Court, and by order dated July 27, 2006, the Commissioner's decision was reversed and remanded for further proceedings. After a second hearing on November 20, 2007, ALJ Stewart issued another decision, on February 15, 2008, finding Mr. Hampton not disabled.

Mr. Hampton was born in 1958, and was 49 years old at the time of the ALJ's second decision. He alleges disability based on a combination of impairments, including Crohn's disease, inflammatory bowel disease, depression, anxiety, and back pain. He has a high
///

FINDINGS AND RECOMMENDATION Page 2

school education and two years of college. He has no past relevant work experience.

## Medical Evidence

The medical evidence in the record does not indicate when Mr. Hampton was diagnosed with Crohn's disease. The earliest records from a gastroenterologist are chart notes from Lane Gastroenterology Associates, indicating that Mr. Hampton was sent several reminders about lab work and office visits in June and July 2001, but did not respond until May 3, 2002, when he called to request a refill for Imuran. Tr. 133. A chart note dated May 21, 2002, written by Mr. Hampton's primary care physician, Gary Brandt, M.D., indicates that he refilled Mr. Brandt's prescription for Imuran, with advice that further refills should come from his new gastroenterologist. Tr. 124.

On June 5, 2002, Nathan Markowitz, M.D., a gastroenterologist at Lane Gastroenterology Associates, wrote that Mr. Hampton was "currently living at home with his father as he has recently lost his current employment in an insurance agency."[1] Tr. 131. Mr. Hampton reported that he was a smoker. Id. Dr. Markowitz wrote that Mr. Hampton had Crohn's disease, "under good control on Imuran but noncompliance for followup on labs. He did miss a month of Imuran." Id. Dr. Markowitz ordered laboratory studies and emphasized that ///

---

[1] Although Mr. Hampton's Social Security records indicate that after 1991, Mr. Hampton had no reported earnings except for $703.13 in 2001, tr. 62-64, 76-77, Mr. Hampton reported that he had worked for Progress Insurance in 2003 doing data entry. Tr. 119.

these need to be followed up on or we will not refill his
medicines. He is given one year refill of Imuran at the
present time. He should be seen back on a yearly basis
for his Crohn's disease.

Id.

In a chart note dated June 5, 2002, Dr. Markowitz wrote that
Mr. Hampton had been on Imuran for Crohn's disease, but

[u]nfortunately, the patient did not follow up and there
are several reports in the office of trying to reach him.
He tells me that he has moved several times. ... He
called about an Imuran refill and wound up getting that
from Dr. Brandt, as we have no record of him following up
on any laboratory studies. He states that he has done
none. The last are from March of 2001. He has actually
felt that he has been in pretty good health overall
otherwise.

Tr. 133.

On November 13, 2002, Dr. Markowitz gave Mr. Hampton a note
stating, "Patient disabled by inflammatory bowel disease." Tr. 132.

On January 3 and January 9, 2003, Mr. Hampton was seen by John
Brandon, a physician's assistant in Dr. Brandt's office, for upper
respiratory infection and dry cough. Tr. 121, 123. He was still
smoking half a pack of cigarettes a day. He had stopped taking his
Imuran. Tr. 123. An x-ray taken January 9, 2003, showed no signs of
infiltrate consolidation or abnormality. Tr. 121, 122.

On July 16, 2003, Dr. Markowitz wrote a letter to Mr. Hampton
saying his office had been unable to reach him for the laboratory
studies, required of patients taking Imuran. Tr. 159. Dr. Markowitz
stated that if he did not hear from Mr. Hampton in one week, he
would stop refilling his prescriptions and discontinue care.
According to Dr. Markowitz, "This is a very toxic drug that

FINDINGS AND RECOMMENDATION Page 4

requires monitoring at least every three months, and the last record I have is from February of 2003." Id.

On September 23, 2003, Dr. Markowitz reviewed a colonoscopy and had "a very extended discussion" with Mr. Hampton about therapy. Tr. 143. Dr. Markowitz wrote,

> While he has been on Imuran he hasn't really taken it. When I asked him, he wasn't taking Imuran because he felt that he was getting nauseated ... He also has missed a lot of work and has had problems working because he has been late because of diarrhea and too embarrassed to talk about it.[2] ... The long and the short of our extensive discussion is that he has agreed to take Imuran regularly ... . I emphasized ... that he needs to be compliant on his blood work and compliant on taking the medicine if we are to find out whether or not it actually works. I am concerned because he has had recurrent symptoms of diarrhea but he hasn't really given a good shot at therapy. ... I think clearly we have a major noncompliance issue here which is making a big difference, of course, in terms of his outcome.

Id.

Dr. Markowitz also encouraged Mr. Hampton to "continue to seek work and [be] aware that he can be supported in terms of possible side effects from his inflammatory bowel disease that may limit him initially." Tr. 142.

Mr. Hampton saw Dr. Markowitz again on February 3, 2004. Tr. 158. Dr. Markowitz thought Mr. Hampton had "pretty good control of symptoms" of his Crohn's colitis with Imuran. Id. He told Mr. Hampton to continue with the Imuran and obtain a chemistry panel every three months. Id.

On August 13, 2004, Dr. Markowitz wrote that Mr. Hampton was "actually doing pretty well from an inflammatory bowel standpoint,"

---

[2] See footnote 1 above.

FINDINGS AND RECOMMENDATION Page 5

writing that his weight had dropped from 216 to 210, due to intentional weight loss from dieting. Tr. 141. He had no GI symptoms. Id. Mr. Hampton complained of an upper respiratory infection, for which he was encouraged to see Dr. Brandt. Id. Dr. Markowitz wrote, "He knows he needs to be on chronic labs every three months. ... He will come back if symptoms develop." Id. Mr. Hampton did not return to Dr. Markowitz until September 2005.

On September 25, 2004, Mr. Hampton saw Dieta Ruschensky, M.D., in Dr. Brandt's office, for complaints of a cough with some wheezing. Tr. 156. Mr. Hampton reported that he was taking Imuran and folic acid for Crohn's disease, but "otherwise feels quite well." Id. Dr. Ruschensky diagnosed bronchitis and prescribed an inhaler. Id. She recommended that he stop smoking. Id.

On February 17, 2005, Mr. Hampton saw a nurse practitioner at Dr. Brandt's office, complaining of cough, wheezing and shortness of breath and episodes of dizziness and weakness. Tr. 155. Mr. Hampton denied a history of asthma, but acknowledged that he smoked. Id. He was diagnosed with upper respiratory infection and prescribed cough syrup and inhalers. Id. A chest x-ray taken on February 18, 2005, was normal. Tr. 366.

Mr. Hampton saw Dr. Brandt on May 25, 2005. Tr. 361. Dr. Brandt wrote that Mr. Hampton complained of fatigue with significant depressive symptoms, as well as flares of diarrhea triggered by nerves. Tr. 361. He was started on Lexapro. Id.

On August 17, 2005, Dr. Brandt noted that Mr. Hampton was unable to tolerate Lexapro because of GI symptoms. Tr. 358. Dr.

FINDINGS AND RECOMMENDATION Page 6

Brandt started him on a trial of Effexor. Id. Dr. Brandt wrote that
Mr. Hampton had "[d]isability issues surrounding student loans,"
and wished Dr. Brandt to "communicate with his student loan carrier
regarding his condition in hopes of having his loan waived." Id.
Dr. Brandt was willing to do so if Mr. Hampton provided forms. Id.

Chart notes from Lane Gastroenterology dated May 6, 2005, to
August 26, 2005, show six unsuccessful attempts to contact Mr.
Hampton to remind him of necessary lab work. Mr. Hampton was
eventually seen by Dr. Markowitz on September 9, 2005. Tr. 351. Dr.
Markowitz wrote that Mr. Hampton was "intermittently compliant,"
taking the Imuran, but only taking three a day, although "[a]ll of
our records indicate that he was told to increase to four a day."
Id. Dr. Markowitz wrote that Mr. Hampton had some increased
diarrhea, but no bleeding and no weight loss--in fact, a weight
increase to 221 pounds. His last colonoscopy showed patchy colitis.
Id. Interval medical history was otherwise negative. Id. Dr.
Markowitz wrote that Mr. Hampton reported no remarkable symptoms
except for fatigue, GI symptoms, anxiety and depression. Id. Dr.
Markowitz concluded, "Crohn's disease, possibly with worsening
symptoms. He is hard to read. Compliance and depression remain an
issue." Id.

Chart notes dated October 28, 2005, to January 3, 2006, show
repeated unsuccessful efforts by Lane Gastroenterology  to contact
Mr. Hampton, by phone and letter, to remind him of lab workups in
order to continue Imuran. Tr. 348.

///

FINDINGS AND RECOMMENDATION Page 7

On January 20, 2006, Mr. Hampton told Dr. Brandt he wanted another GI provider, "having had a falling out with his previous care provider, apparently over interpretation of instructions and followup." Tr. 355. He was referred to Harry Park, M.D. Id. Dr. Brandt wrote that he had been asked to complete a medical source statement by Mr. Hampton's attorney, and had noted that his limitations were predominantly on the basis of joint pain,[3] hayfever, and Crohn's disease. Id.

On February 9, 2006, Mr. Hampton saw Dr. Park. Tr. 369. Dr. Park wrote that Mr. Hampton did not have any significant abdominal pain, nausea or vomiting, although he had about six to seven loose stools daily. Id. Mr. Hampton had not seen bright red blood in his stool. Id. Mr. Hampton stated that the loose stools appeared to be related to stress or anxiety. Id. Dr. Park noted that Mr. Hampton was currently smoking a half pack of cigarettes per day, although he denied chest pain or shortness of breath. Id.

Dr. Park wrote that in spite of the issue with the doctors at Lane Gastroenterology over compliance with medications, Mr. Hampton was "still persistently on 150 mg." of Imuran, despite being told to take 200 mg. Tr. 370. Dr. Park scheduled him for a colonoscopy and, after that, an upper GI series. Id. Mr. Hampton was advised to stop smoking, "as tobacco will make his Crohn's disease worse." Id.

An endoscopy done on March 30, 2006, showed mild Crohn's colitis and simple internal hemorrhoids. Tr. 468.

---

[3] The medical record before the court does not contain any other information about joint pain as of this date, i.e., nothing regarding which joints, and what problems or limitations.

FINDINGS AND RECOMMENDATION Page 8

On May 2, 2006, Mr. Hampton saw Arneyo Perez, M.D., for complaints of cough, shortness of breath, and a lump in the left inguinal region when he coughed, accompanied by occasional abdominal pain. Tr. 465. Dr. Perez diagnosed a left inguinal hernia and referred Mr. Hampton to the surgical department. Id. He also diagnosed seasonal asthma and started him on an inhaler. Id.

On May 11, 2006, Dorothy Anderson, Ph.D., completed a rating of mental limitations for Mr. Hampton, based on a records review. Tr. 372.  In her opinion, Mr. Hampton suffered from depressive syndrome characterized by anhedonia and decreased energy. Tr. 375. She found no limitations in the areas of 1) activities of daily living; 2) maintaining social functioning; and 3) maintaining concentration, persistence, or pace. Id.

On May 15, 2006, Mr. Hampton was admitted to Sacred Heart Medical Center for 10 days, after being injured in a motor vehicle accident in which his father, the driver, died. Tr. 389. His injuries from the accident were bilateral hemopneumothorax, multiple bilateral rib fractures, bilateral pulmonary contusions, a grade 2 splenic injury, right adrenal hematoma, and abrasions. Id. In addition, he was diagnosed with adult onset diabetes. Id. His past medical history was noted to be significant for Crohn's disease and mild asthma. Tr. 423. Mr. Hampton reported that he smoked cigarettes and occasionally drank alcohol. Id. According to Mr. Hampton's family, he was unemployed, but was a caregiver for his father. Id. After placement of chest tubes, an x-ray showed complete resolution of the bilateral pneumothoraces. Tr. 424. X-

FINDINGS AND RECOMMENDATION Page 9

rays of the pelvis and CT scans of the head and cervical spine were unremarkable, with no evidence of injury, fracture or dislocation. Id.

Upon discharge, he was advised to follow up with his primary care physician on the diabetes and to check his blood sugars, but was not started on insulin. Tr. 390. He was not restarted on Imuran for his Crohn's disease, but advised to discuss this with Dr. Brandt. Id. He was also given home oxygen therapy and advised to stay on an 1800 calorie diet. Id.

On May 26, 2006, Mr. Hampton saw Dr. Brandt for followup. Tr. 462. Mr. Hampton reported grief issues surrounding the death of his father. Id. He also complained of swelling in his left calf, and Dr. Brandt ordered an ultrasound because he was at risk for deep venous thrombosis (DVT). Id. The ultrasound was negative. Id.

On June 26, 2006, Mr. Hampton saw Dr. Brandt. Tr. 461. Dr. Brandt wrote that he was "actually feeling much better, coping emotionally with the death of his father reasonably well." Id. He complained of persistent knee pain and swelling since the accident. Id. Otherwise, review of systems was benign. Id. He was compliant with his usual medications and "feeling better daily." Id. A recent evaluation for diabetes was negative. Id. On examination, there was some minimal evidence of effusion on the left knee, but with no warmth or erythema. Range of motion was intact. Id.

An x-ray of the left knee done on July 12, 2006, showed slight irregularity of the trabecular pattern of the left lateral tibial plateau, thought likely to be physiologic. Tr. 459.

FINDINGS AND RECOMMENDATION Page 10

On November 28, 2006, Mr. Hampton saw Scott Kitchel, M.D., for thoracic spine pain. Tr. 447. Mr. Hampton located the pain in the mid back and described it as a deep aching, burning, or pins and needles type of pain, made worse during and after exercise, and with standing or walking. Tr. 447. He reported some relief with lying down and with a TENS unit, but not from medication or physical therapy. Id. He denied significant arm or leg pain, numbness or weakness in the arms or legs, and incontinence. Id. Dr. Kitchel reviewed x-rays and found no evidence of acute or subacute compression fracture of the thoracic spine. Tr. 448. Dr. Kitchel ordered an MRI of the thoracic spine and advised Mr. Hampton to follow up after the MRI. Id.

An MRI of the thoracic spine on December 15, 2006, showed mild degenerative disc disease in the lower thoracic spine, without central canal or foraminal stenosis, and a depression in the superior end plate of the T8 vertebral body with mild anterior wedging. Tr. 444-45.

On February 14, 2007, Mr. Hampton saw Dr. Brandt, complaining of chest congestion, cough and malaise. Tr. 458. Dr. Brandt noted that Mr. Hampton continued to smoke. Id. Dr. Brandt diagnosed bronchitis, chronic tobaccoism and "some element of chronic obstructive pulmonary disease (COPD)." Id. Dr. Brandt prescribed inhalers and encouraged him to stop smoking. Id.

On March 6, 2007, Mr. Hampton returned to Dr. Kitchel. Tr. 440. He reported that he "does occasionally get some thoracic pain." Id. Dr. Kitchel wrote that Mr. Hampton had been sent by his

FINDINGS AND RECOMMENDATION Page 11

attorney to discuss possible permanent impairment, and that Dr. Kitchel had "rendered my opinion on that." Id. [4]

On March 22, 2007, Mr. Hampton saw Dr. Brandt for complaints of back and flank pain on the left, at the site of his chest tube. Tr. 453. Dr. Brandt thought it likely that he would continue to have some pain related to the accident, and, at Mr. Hampton's request, provided him with a note. Id. Review of systems was benign except for cough, related to Mr. Hampton's continuing to smoke. Id. On physical examination, he had minimal tenderness to palpation along the left lateral chest wall around the area of the chest tube scar, but breath sounds were full, with no wheezing, rales or rhonchi. Id. There was some palpable spasm or tenderness in the parathoracic spinal musculature, but the spine was nontender and gait was unremarkable. Id. Dr. Brandt diagnosed chronic musculoskeletal pain related to the motor vehicle accident, "likely waxing and waning indefinitely into the future," but "of questionable significance." Id. Dr. Brandt's note states:

> To Whom It May Concern: Robert has been under my care for some time. I have been asked to correspond on his behalf regarding the long term effects from his May 15, 2006 motor vehicle accident. Robert will continue to have pain related problems well into the future that stem entirely from his accident and will likely impact his employability.

Tr. 479.

A chest x-ray taken March 22, 2007, revealed some new bilateral rib deformities with underlying pleural thickening, thought to be related to the accident, but no pleural effusion or

--------

[4] The record does not indicate what his opinion was.

FINDINGS AND RECOMMENDATION Page 12

pneumothorax. Tr. 457. Heart size was normal. Id.

On March 30, 2007, Mr. Hampton's attorney wrote a letter to Dr. Brandt asking the following question:

> I am trying to estimate the loss of earning capacity of Mr. Hampton due to the motor vehicle accident of May 15, 2006. He has a work life ... expectancy of about 13 years according to the U.S. Department of Labor. Do you believe to a reasonable medical probability that it is likely that his motor vehicle injuries coupled with is [sic] previous medical conditions will make him unemployable during his expected remaining work life?

Dr. Brandt placed a check mark on a line marked "Yes." Tr. 478.

On March 29, 2007, Dr. Park saw Mr. Hampton for followup after his initial visit of February 2006. Tr. 450. Dr. Park wrote that Mr. Hampton had a colonoscopy on March 30, 2006, that showed "evidence of mild Crohn's colitis along with some mild internal hemorrhoids." Id. Dr. Park wrote that "[c]urrently, from the Crohn's perspective, the patient is doing well." Mr. Hampton was taking 200 mg. of Imuran daily and reported having one to two well formed bowel movements daily, with no rectal bleeding and no significant abdominal pain. Id.

### Hearing Testimony

#### First hearing

Mr. Hampton testified at the first hearing, on September 1, 2005, that his Crohn's disease caused severe abdominal pain and rectal bleeding, tr. 321, as well as loose stools and frequent bowel movements, sometimes causing him to stay in the bathroom for as long as 20 minutes, and occurring four or five times a day. Tr. 322-324. He described his depression as, "like all of a sudden I'll

FINDINGS AND RECOMMENDATION Page 13

start crying and worried about the future and just constantly stressed out over what's going to happen to me." Tr. 327. These symptoms occur about once a week, and go away if he thinks of something else or takes the Effexor prescribed for him. Id. He said he has problems remembering things and concentrating. Tr. 328. He gets very nervous about being around new people, and gets anxiety attacks about twice a day. Tr. 329-30. These attacks cause him to feel "sort of incapacitated in a way that I can't deal with people," as well as nauseated. Tr. 330. He is not receiving psychological counseling; he testified that "I thought about it, but I just never did." Tr. 332.

Mr. Hampton testified that "on average," the medications he is taking work for him, tr. 330, but that in the past, he stopped taking them when he was ill because he thought the medications undermined his immune system, until his doctor told him not to discontinue the medication. Tr. 331.

Mr. Hampton's mother, Christine Anderson, testified at the hearing, as did his niece, Jennifer Stump. Tr. 333, 336. Ms. Anderson testified that Mr. Hampton had to go to the bathroom very often. Id. She confirmed that he sometimes spent up to 20 minutes in the bathroom. Tr. 334. She said he got "real nervous and frustrated and can't seem to think straight," on a daily basis. Tr. 336. Ms. Stump also said Mr. Hampton had to use the restroom "all the time." Tr. 337.

The ALJ called a vocational expert (VE), Patricia Lesh. Tr. 338. The ALJ asked her to consider an individual with a high school

FINDINGS AND RECOMMENDATION Page 14

1  education and no relevant work history, unable to work in a place
2  without access to a bathroom facility. Tr. 339. The VE testified
3  that such a person could work as a sedentary assembler and
4  housekeeper/cleaner. Tr. 340. The ALJ then provided a second
5  hypothetical, with the additional limitations of being unable to
6  work with the public or work intensively with coworkers, and
7  limited to following simple instructions. Tr. 340-41. The VE
8  responded that the jobs she identified could be performed with the
9  additional limitations. Tr. 341. Asked by Mr. Hampton's attorney
10 whether an individual would be precluded from those jobs if he were
11 required to be in the bathroom for 20 minutes at a time, five or
12 six times a day, she responded that he would not be able to perform
13 any job. Id.

14     Second hearing

15     On November 20, 2007, at the second hearing, Mr. Hampton
16 testified that since the previous hearing, he had sustained the
17 injuries in the May 15, 2006 car accident, which had resulted in
18 back pain, an inability to lift, and an inability to sit or stand
19 for extended periods of time. Tr. 484. He said he has to lie down
20 frequently. Id. Mr. Hampton said his depression had grown worse, as
21 a consequence of his father's death in the car accident, tr. 485,
22 and said he also seemed to forget things and didn't concentrate as
23 easily. Id. Since the accident he has used his asthma inhaler every
24 day. Id. He feels panicky when he has difficulty breathing. Tr.
25 486. Mr. Hampton testified that he was able to stand about 20
26 minutes before he felt numbness, tingling and pain in his back. Tr.
27
28 FINDINGS AND RECOMMENDATION Page 15

487. Lifting anything heavier than a load of laundry causes pain in his back. Tr. 488. He can sit for about 30 minutes before having to change to a standing position. Tr. 492. He is able to walk less than half an hour before he experiences shortness of breath. Tr. 495. He gets no exercise. Id. The pain in his back is on the right side, from shoulder to waist, in a section about six inches wide. Tr. 491. He uses a TENS unit. Id.

        Asked about whether he had obtained any treatment for depression, Mr. Hampton responded that he had "taken medication for it and it seemed to help, but then I just didn't continue it." Tr. 499.

        A VE, Mark McGowan, testified at the hearing. Tr. 501. The ALJ asked the VE to consider an individual 49 years old, with a high school education and no relevant work experience, unable to work in a place without access to bathroom facilities. The VE identified jobs as a laundry worker, photo copy machine operator, and assembler semi-conductor. Tr. 502. The ALJ then offered a second hypothetical, with additional limitations including carrying no more than 10 pounds frequently, with an occasional 20-pound maximum, an opportunity to change position, standing or walking no more than 20-30 minutes at a time, and no exposure to excessive dust or fumes. Tr. 502-03. The VE testified that such an individual could not perform the laundry worker or photocopy machine operator positions, but could still perform the assembler position, as well as some positions as an assembler of small products. Tr. 503-04. When the ALJ added an additional limitation of being unable to work

FINDINGS AND RECOMMENDATION Page 16

with the public or work intensively with coworkers, and being limited to following simple instructions, the VE testified that the two assembler jobs could still be performed. Tr. 505.

### ALJ's Decision

In his second decision, on February 15, 2008, the ALJ found that Mr. Hampton's colitis/inflammatory bowel disease/Crohn's disease was a severe impairment. Tr. 200. The ALJ noted that Mr. Hampton had testified that he had COPD or asthma as an impairment, but that the February 2005 chest x-ray was normal. The ALJ concluded that in the absence of medical opinions suggesting any restrictions stemming from this impairment, it was not severe. Id. With respect to Mr. Hampton's testimony of thoracic spine pain, the ALJ found that x-rays showed no evidence of acute or subacute compression fracture from the accident, and that by the time of a chart note from Dr. Kitchel in March 2007, Mr. Hampton reported only occasional thoracic pain. Id.   The ALJ concluded that any residual effects of the thoracic compression and degenerative disease had not been shown to cause vocational restrictions.

On Mr. Hampton's claimed impairment of depression, the ALJ acknowledged that Dr. Brandt had noted fatigue with "significant depressive symptoms" in May 2005, and that Dr. Markowitz mentioned a complaint of depression in September 2005. Tr. 201. However, the ALJ found that the medical record "did not declare symptoms associated with the claimant's depression: although Mr. Hampton's doctors reported what he told them, none of them mentioned clinical findings or observations, and later records did not even include

FINDINGS AND RECOMMENDATION Page 17

depression as a diagnosis. Id. The ALJ concluded, "Every indication is that it was transitory and controllable with medication." Id. The ALJ also cited to the opinion of Dr. Anderson in May 2006, based on a records review, that Mr. Hampton did not have a severe impairment, and had no limitations in activities of daily living, social functioning, concentration, persistence or pace, or episodes of decompensation. Tr. 201-02.

The ALJ found that Mr. Hampton's testimony about the duration, frequency, and intensity of his symptoms was not fully credible. Tr. 203. The ALJ noted Dr. Markowitz's statements in June 2002 and again in February 2004 that Mr. Hampton's Crohn's disease was under good control on Imuran. Tr. 204. Six months later, Dr. Markowitz wrote that Mr. Hampton was "doing pretty well from an inflammatory bowel standpoint," with no GI symptoms and normal lab results. Id. The ALJ noted that the characterization of Mr. Hampton's bowel disease as mild, or observations that he was doing well, continued in the record through 2006. Id. Further, the ALJ found Mr. Hampton's ability to gain weight was inconsistent with the alleged effects of the impairment, noting evidence that Mr. Hampton's weight had gone from 203 in 2001 to 212 in 2002 and 220 in 2003. Id. The ALJ found that the evidence suggested "some disinterest by the claimant in doing all he can to control his alleged symptoms," noting that Mr. Hampton continued to smoke while complaining of coughs and upper respiratory infections, and despite much medical advice to stop smoking because it exacerbated his Crohn's disease. Id. The ALJ also noted Mr. Hampton's frequent failures to follow up

FINDINGS AND RECOMMENDATION Page 18

1  with examinations for his gastrointestinal problems and the
2  laboratory studies required for Imuran, and lack of compliance with
3  taking medications. The ALJ concluded, "The overall record points
4  to a relatively mild condition that can be controlled adequately
5  with appropriate medications." Id.

6  _____The ALJ found Mr. Hampton's credibility weakened by his work
7  history, which suggested "disinterest or lack of success in
8  employment." Tr. 205. The ALJ wrote that despite Mr. Hampton's
9  completion of training in the field of electronics in 1987, he
10  posted earnings of more than $15,000 in only two subsequent years;
11  other than minimal posted earnings in 1989 and 1990, "the claimant
12  was unemployed for 10 years prior to his alleged disability onset
13  date of November 1, 2000." Id.

14  The ALJ acknowledged that Dr. Markowitz had written a one-
15  sentence opinion stating that Mr. Hampton was disabled by
16  inflammatory bowel disease, but found that the statement provided
17  no evidence in support of the opinion, and was inconsistent with
18  Dr. Markowitz's office notes showing good control with medication
19  but noncompliance. Id. The ALJ also considered Dr. Brandt's check
20  mark next to "yes" in response to a three sentence form submitted
21  by Mr. Hampton's lawyer. The ALJ gave this opinion no weight
22  because the document did not reference specific medical conditions
23  and Dr. Brandt did not list any objective medical findings to
24  support his conclusion that Mr. Hampton was unable to work for the
25  rest of his life. Id. Similarly, the ALJ found Dr. Brandt's "To
26  Whom It May Concern" letter in March 2007 not worthy of much weight
27
28  FINDINGS AND RECOMMENDATION Page 19

1   because Dr. Brandt did not explain how the "pain related problems"

2   would affect Mr. Hampton's employment and contained no medical

3   findings in support of his opinion. Tr. 206. Further, the ALJ found

4   the opinion of questionable validity in light of a contemporaneous

5   office note characterizing Mr. Hampton's musculoskeletal pain as

6   being of "questionable significance." Id.

7       The ALJ found that Mr. Hampton had the residual functional

8   capacity to perform any level of exertional activity so long as he

9   had access to a nearby bathroom. Tr. 202. Based on the VE's

10  testimony, the ALJ concluded that Mr. Hampton had the ability to do

11  work that exists in significant numbers in the national economy,

12  and found him not disabled. Tr. 208.

13                          **Standard**

14      The court must affirm the Commissioner's decision if it is

15  based on proper legal standards and the findings are supported by

16  substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111,

17  1113 (9th Cir. 1999). Substantial evidence is such relevant evidence

18  as a reasonable mind might accept as adequate to support a

19  conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971);

20  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In

21  determining whether the Commissioner's findings are supported by

22  substantial evidence, the court must review the administrative

23  record as a whole, weighing both the evidence that supports and the

24  evidence that detracts from the Commissioner's conclusion. Reddick

25  v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the

26  Commissioner's decision must be upheld even if "the evidence is

27

28  FINDINGS AND RECOMMENDATION Page 20

susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. <u>Meanel</u>, 172 F.3d at 1113; <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

FINDINGS AND RECOMMENDATION Page 21

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

FINDINGS AND RECOMMENDATION Page 22

**Discussion**

1.    Failure to develop the record regarding possible mental impairment

Mr. Hampton asserts that the ALJ failed to follow the mandate of the district court to develop the record on this impairment, because the ALJ reached his decision that Mr. Hampton did not have severe mental impairments solely on the basis of reviewing psychologist Dr. Anderson's assessment. He argues that in her records review, Dr. Anderson considered only fatigue and loss of interest in activities, while Mr. Hampton testified at the hearing to other symptoms, including anxiety, depression, panic attacks, crying spells, difficulty with memory and concentration, and difficulties around people or in new situations. Mr. Hampton points out that his mother corroborated some of this testimony, but that the ALJ nevertheless failed to have him examined or obtain medical advice about the significance of Mr. Hampton's symptoms.

The ALJ has a duty to fully and fairly develop the record and to assure that the claimant's interests are considered, even when claimant is represented by counsel. Smolen v. Chater, 80 F.3d 1273 (9th Cir. 1996). However, the ALJ's duty to develop the record is triggered "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 262 F.3d 963, 968 (9th Cir. 2001), *as amended*, 276 F.3d 453 (9th Cir. 2002). The duty does not extend to a silent record that does not support disability. Armstrong v. Commissioner, 160 F.3d 587, 589 (9th Cir. 1998). Thus, while the ALJ is not a

FINDINGS AND RECOMMENDATION Page 23

"mere umpire," Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1991), the burden of establishing an impairment remains at all times upon the claimant. Yuckert, 482 U.S. at 146; Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005). No authority suggests that the regulations require the ALJ to continue developing the record until disability is established; the regulations require only that the ALJ assist the claimant in developing a complete record. Yuckert, 482 U.S. at 146.

The existence of mental symptoms other than those considered by Dr. Anderson--anxiety, depression, panic attacks, crying spells, difficulty with memory and concentration, and difficulties around people or in new situations-- is supported only by the testimony of Mr. Hampton. The ALJ found his testimony not fully credible, and Mr. Hampton does not challenge that finding. I also find no error in the ALJ's conclusion that Mr. Hampton's mental symptoms were fleeting and controlled with medication. Mr. Hampton testified at that he had "thought about" but never sought mental health therapy, and that although medication had helped, he had stopped taking it. This testimony is consistent with the ALJ's finding. Absent any evidence other than Mr. Hampton's somewhat discredited testimony to support the existence of a severe mental impairment, I conclude that the ALJ had no duty to assume Mr. Hampton's burden of proof by developing further evidence to support Mr. Hampton's claimed mental impairments.

> 2.    Failure to give further consideration to RFC in light of evidence of frequent need for bathroom access

Mr. Hampton also assigns error to the ALJ's decision because,

FINDINGS AND RECOMMENDATION Page 24

although the ALJ included in his hypothetical to the VE a claimant who was limited to work environments that allowed restroom access, the ALJ disregarded the testimony of Mr. Hampton and his mother about his need to spend substantial amounts of time in the bathroom in formulating the hypothetical. Mr. Hampton argues in his brief that the ALJ disregarded testimony from himself that he was in the bathroom for 20 minute periods that occurred four to five times per day, and his mother's testimony that he "sometimes" spent up to 20 minutes at a time in the bathroom.

As noted above, the ALJ did not find Mr. Hampton's testimony fully credible, and Mr. Hampton has not challenged that finding. Credibility determinations bear on evaluations of medical evidence when an ALJ is presented with inconsistency between a claimant's subjective complaints and his diagnosed conditions. Webb v. Barnhart, 433 F.3d 683, 688 (9th Cir. 2005). The ALJ's conclusion that Mr. Hampton's testimony was not entirely credible must therefore be taken into account when evaluating his residual functional capacity.

The record does not support Mr. Hampton's argument that the ALJ's hypothetical to the VE should have included the necessity of being in the bathroom 20 minutes at a time four to five times per day. The ALJ noted the inconsistency between Mr. Hampton's testimony and Dr. Markowitz and Dr. Park's consistent characterization of Mr. Hampton's bowel disease, from 2004 to 2006, as mild, being under good control on Imuran, and not manifesting GI symptoms. The ALJ also noted the inconsistency between Mr.

FINDINGS AND RECOMMENDATION Page 25

Hampton's testimony of spending 20 minutes at a time in the bathroom several times a day and his steady weight gain, his continuing to smoke despite being advised that it would exacerbate his Crohn's disease, and his noncompliance with taking medications as prescribed. See, e.g., <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346 (9th Cir. 1991)(en banc)(unexplained, or inadequately explained, failure to follow a prescribed course of treatment is a relevant factor in assessing credibility). I find no error, therefore, in the ALJ's conclusion that Mr. Hampton's bowel disease was relatively mild and under adequate control with medication, and not including Mr. Hampton's testimony about the duration of his bathroom breaks in the hypothetical to the VE.

## Conclusion

I recommend that the Commissioner's decision be affirmed.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due July 21, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due August 4, 2009, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 2nd day of <u>July</u>, 2009.


<u>/s/ Dennis James Hubel</u>

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FINDINGS AND RECOMMENDATION Page 27